427 B.R. 673 (2010)
In re J.S. II, L.L.C., et al.
No. 07 B 3856.
United States Bankruptcy Court, N.D. Illinois, Eastern Division.
April 9, 2010.
*674 Allen J. Guon, Shaw Gussis Fishman Glantz Wolfson & Tow, Chicago, IL, Daniel L. Stanner, Tabet Divito & Rothstein, Chicago, IL, Janice A. Alwin, Shaw Gussis Fishman Glantz Wolfson & Tow, Chicago, IL, Matthew A. Swanson, Barack Ferrazzano Kirschbaum & Nagelberg, Chicago, IL, Patrick A. Clisham, Peter J. Roberts, Richard A. Saldinger, Steven B. Towbin, Vipin R. Gandra, Shaw Gussis Fishman Glantz Wolfson & Tow, Chicago, IL, for Debtor.

AMENDED ORDER ON MOTION TO ENFORCE AUTOMATIC STAY
JACQUELINE P. COX, Bankruptcy Judge.

BACKGROUND
Debtors, J.S. II, L.L.C. ("J.S. II"), River Village I, L.L.C. ("River Village I"), River Village West, L.L.C. ("River Village West") and KND Investments ("KND"), filed for protection under Chapter 11 of the Bankruptcy Code ("Code") on March 5, 2007. On March 8, 2007 an order was entered allowing the Debtors' estates to be jointly administered pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 1015(b), which allows joint administration of the estates of two or more related debtors.
The Debtors were organized to acquire, develop, finance and sell industrial and residential real estate located on the near south side of Chicago, Illinois ("Chicago"). Their main venture is Bridgeport Village ("Project"), a development of 115 homes along the south branch of the Chicago River. The Debtors previously owned three industrial properties in the area which they leased to various entities. They also had an option to purchase additional real estate in the area.
The Project was managed by Thomas Snitzer ("Snitzer"), a J.S. II member, and the Snitzer Family LLC ("SFLLC") (collectively, the "Snitzer Parties"). In 2003 a subcontractor complained about safety issues. Snitzer assured John Kinsella ("Kinsella") and Sidney Diamond ("Diamond"), the remaining members, that he had investigated the concerns and found that there were no problems. Between May 2002 and November 2004 the City of Chicago (the "City") issued seventy-eight Stop Work Orders against the Project; most were for work performed contrary to what was allowed by the permits issued by the City. The City discovered numerous building code violations, including the following: many homes were missing a required means of egress from the third floor; garage rooftop decks had been constructed without permits or verification that they were structurally adequate and neither Snitzer nor the Project's construction manager had obtained a general contractor's license or bond.
The City shut down the Project in November 2004 due to the various permit and building code violations. Allegedly, City officials lifted the Stop Work Orders after Snitzer promised to address the City's concerns. *675 According to Kinsella and Diamond, Snitzer later refused to meet with City officials and never told Kinsella or Diamond about the shutdown. In January 2005, the City shut down construction at the site a second time. As a result, the Project's initial lender, Bank of America, declared the Project's loan in default.
Kinsella and Diamond discovered that many homes had safety violations; that unpaid subcontractors filed mechanics liens on portions of the Project; that obligations totaling $2 million were not reflected on the books; that various lawsuits had been filed against the Debtors; that rental revenues were improperly transferred out of certain accounts and that premiums had not been paid for the Project's liability insurance. In addition, many homeowners complained that Snitzer failed to complete construction "punch list items", an industry term for problems discovered after a homeowner takes possession.
Diamond and Kinsella succeeded in having the City forego suing the Debtors in Housing Court. Snitzer responded to their intervention by suing them in a state court Chancery action seeking to enjoin their interference with his management of the Project. Kinsella and Diamond filed a multi-count counterclaim against the Snitzer Parties. That litigation included allegations of breach of fiduciary duty and negligence. The state court enjoined the Snitzer Parties from interfering with the management and control of the Project and from acting as the manager of River Village I, River Village West and J.S. II.
Jose and Sandra Ruiz purchased two homes in this development. On June 30, 2003 they purchased the 1208 West 33rd Place, Chicago, Illinois property ("House No. 1"). The Ruizes purchased a second property at Bridgeport Village, 1316 West 33rd Street, Chicago, Illinois ("House No. 2") on March 10, 2006. The Ruizes filed Claim No. 44 herein for $6,964,517.60 on June 4, 2007.
The Explanation of Claims of Jose and Sandra Ruiz, attached to their Proof of Claim No. 44, In re J.S. II, L.L.C., case no. 07 B 3856 (Bankr.N.D. Ill. June 4, 2007) (filed on behalf of creditors Jose and Sandra Ruiz) (hereafter the "Proof of Claim Explanation"), states that the Debtors notified the Ruizes on April 25, 2006 that House No. 1 was built in violation of the Code. The Ruizes claim that they discovered many latent defects with respect to House No. 2 including: (1) water leaks on the ceiling of the second floor front master bedroom; (2) water damage to the third floor front bedroom flooring; (3) cracks in the basement ceiling; (4) that the main waste line was not connected to the city sewer system; (5) damage to the third floor door frame leading to the deck; (6) that the east wall masonry was not connected to the main foundation; (7) that the air conditioning system was not connected; and (8) the failure to build House No. 2 according to City of Chicago wind resistant standards. See Proof of Claim Explanation at ¶ 2(C).
On October 17, 2007 the Ruizes filed a Motion to Compel Debtor to Honor Homeowner Warranty Claims and to Repair Punch List Items and to Bring Their House Up to Code. See 07 B 3856, Dkt. No. 290, October 17, 2007. On November 13, 2007 that motion was denied. The court explained that the motion was a request for injunctive relief which should be pursued under Federal Rule of Bankruptcy Procedure 7001 as an adversary proceeding; the effort was premature as Debtors' Objections to Claims were not due until January 15, 2008; the movants did not indicate how much it would cost the Debtors to comply with the request; and that resolution of the matter by motion would preempt the bankruptcy claims *676 process. The court noted that requiring the Debtors to make certain repairs could be a waste of resources if demolition were to be required in the future. The court also noted that the status of the building code violation case was not of record and that it could make a difference in terms of what repairs were required by law. See Order on 07 B 3856, Dkt. No. 350, November 13, 2007.
On October 14, 2008 at a hearing set on the Debtors' Objection to the Ruizes' Claim the Ruizes withdrew their claim. The case was passed when the court stated that if it was to be withdrawn, it would be with prejudice. It was subsequently withdrawn. The court ruled that the withdrawal was with prejudice. The Debtors spent resources and time preparing the Objection and preparing for the October 14, 2008 hearing.
Jose Ruiz and Sandra Ruiz had been members of the Creditors' Committee upon appointment by the Office of the United States Trustee before they withdrew their claim. See 07 B 3856, Dkt. No. 51, March 16, 2007.
Instead of participating in the bankruptcy case, on November 23, 2009 the Ruizes commenced Civil Action 1:09-cv-07358 (the "civil action") in the District Court of the Northern District of Illinois against J.S. II, L.L.C., River Village I, L.L.C., and several other nondebtor persons and entities.
All allegations therein concern the construction matters in issue in the bankruptcy case. With one exception, the conduct complained of occurred before the March 5, 2007 filing date of this bankruptcy case. That exception is an allegation on page 49 at paragraphs 127-128 that the Ruizes' home was foreclosed upon by the bank on July 31, 2008.
Section 362 of the Bankruptcy Code provides, in pertinent part:
(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, ... operates as a stay, applicable to all entities, of 
(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
11 U.S.C. § 362(a).
The automatic stay was enacted "`to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor.'" In re Pleasant, 320 B.R. 889, 893 (Bankr.N.D.Ill.2004) (quoting In re Rexene Prods. Co., 141 B.R. 574, 576 (Bankr.D.Del.1992)).
The Ruizes claim that their civil action is not barred or stayed by the automatic stay because it is based on postpetition claims personal to them and that they did not have certain actionable information in time to file a claim in the bankruptcy case. They want this court to believe that the civil action is based on conduct other than what they addressed in Claim No. 44.
A review of the complaint in the civil action belies the Ruizes' position. By content, substance and date, the court finds that as to Debtors J.S. II, L.L.C. and River Village I, L.L.C., the civil action mirrors the conduct and conditions that the Ruizes addressed in Claim No. 44 herein. The court concludes that the *677 Ruizes violated the automatic stay by filing the civil action against entities whose bankruptcy cases were open. That violation makes the civil action void as to Debtors J.S. II, LLC and River Village I, LLC. See Kalb v. Feuerstein, 308 U.S. 433, 438, 60 S.Ct. 343, 84 L.Ed. 370 (1940).
The Ruizes suggested several times at the hearing of this contested matter that they have the right to pursue their claims because they discovered evidence of fraud after the October 14, 2008 withdrawal of their claim. The court asked several times what they discovered that they could not have sought or obtained before October 14, 2008.
The court asked why the Ruizes' attorney thought that information regarding fraud was unavailable before the end of 2008. The attorney stated that it was talked about in the 2005 Chancery matter and in a newspaper. The attorney stated that until all of the information, which the city refused to release, was obtained and the plaintiffs were in a position to certify under oath that a fraud had occurred, that they could not meet the heightened fraud pleading standard. The court notes that the Ruizes asserted fraud in Claim No. 44. The attorney argued that the Ruizes' claims did not arise before the bankruptcy case was filed, that the conduct and claims occurred postpetition and that they are based on recently obtained information. He said that the District Court case alleges multiple conspiracies involving the City of Chicago, Debtor J.S. II and other parties, but, according to him, does not allege a specific time during which such occurred. Transcript at 11-14.
There was no explanation of what that late-discovered information is. The court asked for it directly; no answer was given. The court stated that it was not being told anything that supported the Ruizes' delay in pursuing fraud claims. Transcript at 45.
There was a suggestion that the Ruizes acquired information through Freedom of Information requests. Without being given any explanation of when, how or to whom those requests were made, the court asked why the requests were not pursued earlier. The response was that Mr. Ruiz represented himself pro se when that effort was made. Transcript at 45-46. The court notes that the Ruizes were represented by Attorney Forrest Ingram in 2007 when they pursued the Motion to Compel Debtors to Honor Homeowner Warranty Claims and to Repair Punch List Items and to Bring Their House Up to Code. See 07 B 3856, Docket No. 290, October 17, 2007.
Snitzer, who once managed the Bridgeport Village Project, sought the deposition of 11th Ward Alderman James A. Balcer. Leave of court was granted to conduct a Federal Rule of Bankruptcy Procedure 2004 examination of the alderman. See 07 B 3856, Dkt. No. 272, September 27, 2007. He was examined. The court has consistently herein.
There has been no explanation of the Ruizes' claim that they could not obtain sufficient information in time to defend their claim against the Debtors' Objection to Claim on October 14, 2008 or to pursue fraud before October 14, 2008.
The court was told that the Ruizes can seek civil redress because of information discovered after the withdrawal of a claim. No legal support was asserted for this argument. It is waived. United States v. Berkowitz, 927 F.2d 1376, 1384 (7th Cir. 1991).
The attorney for Snitzer, Mr. Edward Feldman, aptly pointed out that the timing of discovery of information is not relevant to whether a stay violation has occurred, but is instead relevant to a statute of limitations inquiry.
*678 At no point in the hearing on March 3, 2010 did the Ruizes' attorneys explain what information allowed the filing of the civil action in spite of the pending bankruptcy case. The court made it clear that parties who sought discovery from the City of Chicago and its agents and its alderman were accommodated. The court is not aware of any effort by the Ruizes to seek information; certainly none was addressed to this court at the March 3, 2010 hearing.
The assertion that the claims herein belong uniquely and exclusively to the Ruizes in a way that justifies the non-application of the automatic stay is baseless. In In re Teknek, 563 F.3d 639, 644 (7th Cir.2009) the Seventh Circuit explained that when it is argued that claims are personal and independent from any claim a hypothetical general creditor could assert and that their damages are peculiar, it may mean "all creditors' claims would be personal to the specific creditor" and that no creditor would have to wait in line behind the bankruptcy trustee to assert her claims. This court finds that the Ruizes' claims are not personal, unique or separate as they arise out of the same facts and occurrences alleged by the Ruizes when they participated in the bankruptcy case and because it has not been shown that they arise out of conduct and conditions different from those complained of by other Bridgeport Village homeowners, some of whom have settled their claims within the bankruptcy claims process. See 07 B 3856, Dkt. No. 1075, October 27, 2009 and Proof of Claim No. 67.
The Ruizes filed a Response to the Motion to Enforce The Automatic Stay on February 18, 2010, Docket No. 1238. They assert in paragraph 59 therein that they did not know about the claims made in the civil action until after this Chapter 11 case was commenced and therefore that the claims did not arise before the commencement of this bankruptcy case. This is not true; the Ruizes' Claim No. 44 herein belies this assertion. They made the same claims herein as in the civil action, all of which are based on the Debtors' prepetition conduct and the condition of the homes the Ruizes purchased in 2003 and 2006, matters that precede the March 5, 2007 filing of this bankruptcy case. The assertion that this matter is a postpetition concern is baseless.
The court finds that this assertion is untrue and notes that the Ruizes have not explained how the two matters reflect or involve different conduct or concerns. The court finds that this represents a violation of Federal Rule of Bankruptcy Procedure 9011(b)(2) and (b)(3). FRBP 9011 requires that all pleadings be signed by an attorney or a party who is not represented by an attorney.
Rule 9011 provides that:
By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,
(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable *679 opportunity for further investigation or discovery; and
(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.
This court concludes that the Response to the Motion to Enforce the The Automatic Stay was filed without legal or factual support. It was signed by Attorney Anthony J. Peraica.
The contents of Claim No. 44 and the conduct and conditions complained of in the civil action concern the same matter, the inadequacies of the homes sold in the Bridgeport Village development. Neither in the Response nor at the hearing was an effort made to distinguish the two matters.
The Motion to Enforce the Automatic Stay is granted. Jose Ruiz and Sandra Ruiz have willfully violated the automatic stay of 11 U.S.C. § 362. Jose Ruiz and Sandra Ruiz are ordered to dismiss with prejudice Civil Action 1:09-cv-07358 as to J.S. II, L.L.C. and River Village I, L.L.C. on or before April 14, 2010.
The willful violation of the automatic stay has injured Debtors J.S. II, L.L.C. and River Village I, L.L.C. causing them to incur attorneys' fees and expenses in litigating the issues herein. The Debtors are hereby awarded attorneys' fees and expenses and may submit a petition for the attorneys' fees and expenses incurred in their efforts to enforce the automatic stay on or before April 20, 2010.
Jose Ruiz and Sandra Ruiz are hereby ordered to reimburse the Debtors for the attorneys' fees and expenses incurred herein.
Jose Ruiz and Sandra Ruiz are assessed punitive damages of $10,000.00 for their willful violation of the automatic stay. Punitive damages are warranted because the positions they have taken herein have no legal or factual support and because they failed to seek modification of the automatic stay before the civil action was filed.[1]
Attorney Anthony J. Peraica may have violated FRBP 9011. His signature on the Response to the Motion to Enforce The Automatic Stay is supposed to mean that his contentions therein are legally and factually sound.
Pursuant to FRBP 9011(c)(1)(B) Attorney Anthony J. Peraica is ordered to show cause why he has not violated FRBP 9011(b) with regard to the legal contentions and factual representations made in the Response to the Motion to Enforce the Automatic Stay. That Show Cause hearing is set for April 20, 2010 at 11:00 a.m., courtroom 619, 219 South Dearborn Street, Chicago, Illinois.
NOTES
[1] The attorney for the City of Chicago asked this court to suggest to the District Judge responsible for the civil action that it be stayed until appeals of this matter have been exhausted. This court trusts the judgment of the District Judge and does not see a need to suggest that she proceed in a certain manner.

The City's attorney also asked that this court enforce the automatic stay as to all Defendants in the civil action. Transcript at 59. The court will not enforce the stay as to all Defendants or find that the civil action is void as to all named Defendants at this time. Those parties can pursue their options.